GRAPHIC PRESS, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2283–71. Filed August 7, 1973.

*R. Anthony Case*, for the petitioner.
*Sheldon M. Sisson* and *B. D. McDaniel*, for the respondent.

---

HALL, *Judge:* Respondent determined a deficiency of $188,248 in petitioner's Federal income tax for the taxable period July 1 to December 6, 1967. The issue for decision is whether petitioner, which received and reinvested a $725,000 condemnation award, must include in income for that period $392,184, or any part thereof, on the ground that such amount was paid for something other than property involuntarily converted as a result of condemnation.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner, Graphic Press, Inc., is a California corporation which had its principal place of business in Los Angeles, Calif., at the time it filed the petition. Its Federal income tax return for the taxable period July 1 to December 6, 1967, was filed with the district director of internal revenue at Los Angeles, Calif.

Petitioner had engaged in the lithography business at 3825 City Terrace, Los Angeles, since 1948, printing financial reports for major corporations and doing general color advertising. Its plant was improved with one of the largest, most modern, high-speed lithography printing press operations in the western part of the United States. Petitioner had the reputation of doing high-quality work together with meeting guaranteed delivery dates. Maintaining this reputation was important to petitioner.

In December 1966 petitioner was notified by the California Department of Public Works, Division of Highways, that the State intended to begin condemnation proceedings to obtain the entire 3825 City Terrace property in order to widen the San Bernardino Freeway. Thereafter, petitioner's attorney conducted negotiations with the State concerning the purchase price for the land and building. Such negotiations included extensive consideration of petitioner's massive printing presses and other machinery. Such machinery constituted fixtures which were a part of petitioner's real property under State law. Because of that fact, the State's right to condemn the land and building carried with it the correlative obligation to condemn and pay for the machinery, unless the State could negotiate some relief from this obligation. The machinery's fair market value (the amount which the State would have been required to pay had it condemned the machinery) very substantially exceeded the amount which the State would have been able to realize upon disposition of the machinery. The State's appraisal value of the machinery to be relocated was $915,060. However, it was the State's experience that when it sold machinery of this sort at auction it generally sold for only about 10 percent of its appraised value. Accordingly, the State sought to obtain petitioner's agreement to sell the land and building without the machinery, and it was agreed for the purpose of the negotiations that if a satisfactory

settlement could be reached, petitioner would move its machinery (other than machinery which did not lend itself to relocation) rather than require the State to purchase it. Under California law, the State could not reimburse petitioner for moving expenses in excess of $3,000 or for lost profits in any amount.

Petitioner retained real estate and machinery appraisers and a management consultant. The professional appraisers retained by petitioner, and the State's appraisers, determined that the value of petitioner's land and building and the cost of moving petitioner's machinery were as follows:

|  | *Petitioner* | *California* |
|---|---|---|
| Value of land and building | $284,000 | $282,500 |
| Cost of moving machinery | 135,000 | 138,500 |
| Total | 419,000 | 421,000 |

Petititoner's and the State's appraisals of the land and building together with all machinery at 3825 City Terrace were $1,332,493 and $1,232,868, respectively. The machinery had a fair market value of not less than $950,368 ($1,232,868 less $282,500).

Negotiations between petitioner's attorney and the acquisition agent for the Department of Highways included discussions concerning among other things the value of petitioner's land and building, petitioner's cost of moving its equipment, and petitioner's fixed overhead costs of maintaining machinery while it was not in operation. The management consultant retained by petitioner estimated total business interruption costs caused by the condemnation (exclusive of the cost of relocating the machinery) would be $284,477.

As the result of the business necessity of ordering new machinery and equipment at least 1 year before the required delivery date, and in order to avoid being placed in an untenable negotiating position, petitioner advised the State's representative during negotiations that if an acceptable settlement could not be obtained shortly, it would order new machinery and proceed with the settlement only on the basis that the State buy all the machinery in its plant at 3825 City Terrace.

As a result of extended negotiations, in June 1967 the State of California and petitioner arrived at a settlement in which it was agreed that petitioner would move most of its machinery and that the State would be relieved of the obligation it would otherwise have had to purchase that machinery. The parties executed a form contract entitled "Right-Of-Way Contract—State Highway" on or about June 30, 1967, which provided that the State would pay petitioner "the sum of $725,000 for the [3825 City Terrace] property or interest therein as conveyed" by grant deed. The contract provided further:

7. It is understood and agreed by and between the parties hereto that payment [of $725,000] * * * includes but is not limited to payment for [machinery and

fixtures listed in Exhibit A to the contract] * * * which are considered to be part of the realty and are being acquired by the State in this transaction.

8. It is understood and agreed that grantor [petitioner] shall retain and remove the following items considered as realty [machinery and fixtures listed in Exhibit B to the contract] * * * In the event grantor fails to remove said items within the time limit specified, said items shall become the property of the State to dispose of as it sees fit.

The contract also provided the State would pay up to $3,000 for the cost of moving personal property upon receipt from petitioner of paid, itemized bills for such moving expense.

Neither petitioner nor anyone acting on its behalf agreed to any breakdown of the $725,000 award. The State acquisition agent's Right-of-Way Data Sheet showed that the State allocated the $725,000 award $600,500 to improvements and the remainder to the land. The State did not pay for lost profits or moving expenses in excess of $3,000.

On its return for the short taxable year ending December 6, 1967, petitioner reported that the funds received from the State were solely from the sale of the land, the building, and the machinery and equipment taken by the State in the condemnation proceeding. Its basis in the 3825 City Terrace property taken was $197,137. The proceeds of the condemnation award were reinvested in property similar to that taken, and pursuant to section 1033 [1] petitioner elected to defer recognition of its $500,707 gain.[2]

Respondent determined that $407,192 of the $725,000 condemnation award constituted "ordinary income." In his notice of deficiency respondent increased petitioner's ordinary income by $392,184, computed as follows:

| | | |
|---|---:|---:|
| Amount received | | $725,000 |
| Less amounts paid for property taken: | | |
| Land | $124,500 | |
| Improvements | 158,000 | |
| Machinery | 35,308 | (317,808) |
| Ordinary income | | 407,192 |
| Less allocable portion of legal fees [1] | | (15,008) |
| Net increase in income | | 392,184 |

[1] Petitioner deducted legal expenses of $26,800. Respondent allowed 56 percent of this amount, or $15,008.

---

[1] All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.

[2] Petitioner determined the deferred gain for the condemnation award as follows:

| | | |
|---|---:|---:|
| Net received on condemnation | | $724,644.09 |
| Less: Legal and accounting fees | $26,800.00 | |
| Basis of assets | 197,137.03 | (223,937.03) |
| Deferred gain on condemnation | | 500,707.06 |

At one place in the statement attached to the statutory notice of deficiency, respondent referred to the $392,184 net increase in income as "reimbursements for costs to relocate."

Of the $725,000 award, $407,192 represented payment by the State to petitioner for petitioner's waiver of its right to have the machinery condemned along with the land and building.

### OPINION

Petitioner contends that the entire condemnation award of $725,000 was paid for involuntarily converted property, and is subject to the nonrecognition provisions of section 1033. Respondent argues that the award is severable into two components, $317,808 paid for the property condemned and $407,192 paid for moving expenses and lost profits, and that the latter sum less $15,008 attorney's fees, is includable in ordinary income. We agree with respondent's result, although not with his precise rationale.

Under section 1033, gain realized upon the involuntary conversion of property may go unrecognized if the proceeds are properly reinvested. But this Court has held that not all of a condemnation award necessarily constitutes payment for property taken, and that any such portions which do not constitute payment for property are ineligible for nonrecognition under section 1033. *Russell C. Smith*, 59 T.C. 107 (1972) ; see *Vaira* v. *Commissioner*, 444 F. 2d 770 (C.A. 3, 1971). But cf. *Conran* v. *United States*, 322 F. Supp. 1055 (E.D. Mo. 1971).

The factual pattern here is not really in dispute, and the question essentially, therefore, is one of law. The issue is whether petitioner is correct in its assertion that some legal barrier precludes us from subjecting the payment in this case to the scrutiny normal in tax cases to determine whether its characteristics are compound. The State here in fact sought and achieved not one but two objectives. It wished to buy petitioner's land and building and it wished to be relieved of what (in the absence of such relief) would have been its correlative legal obligation to buy petitioner's printing machinery at fair market value. Since the fair market value of the machinery for condemnation purposes was greatly in excess of the price it would probably have brought when sold at auction by the State, the legal obligation to buy the machinery was an onerous one. The State was prepared to pay, and in a realistic sense did pay, to be relieved of it. Although the agreement recited that the $725,000 was being paid for the land, building, and certain machinery, clearly no such price would have been paid for such property, which both parties' experts agreed had a much lower fair market value, had petitioner not concurrently agreed to retain and remove its printing machinery and thereby relieve the State of its

obligation to purchase it. Petitioner argues, however, that the recital in the agreement that the $725,000 was paid for the building, land, and certain machinery is binding on respondent as a matter of law, and that this Court must stop its ears to respondent's arguments that part of the $725,000 in reality purchased something else.

Respondent argues that part of the price represented payment to petitioner for moving the machinery. Petitioner counters, correctly, that under California law the State could not make any such payment in excess of $3,000. But the State in fact paid for petitioner's waiver of the State's obligation to buy the machinery at a price far in excess of what the State believed it could realize on it. Having obtained the waiver, it was presumably a matter of relative indifference to the State what petitioner then did with the machinery. While petitioner no doubt considered its projected moving costs and related expenses in the bargaining over what it would charge the State for the desired waiver, the waiver, rather than the move itself, was the true subject of bargaining. Petitioner spelled it out clearly enough when it advised the State that unless it came to terms promptly, the State was going to have to buy the machinery. And the contract itself spelled out the waiver in effect when it provided that "grantor shall *retain* and remove the [machinery]" (emphasis added), but that if "grantor fails to remove said items within the time limit specified, said items shall become the property of the State."

However clear it may be as a matter of *fact* that an important bargained- and paid-for element of the transaction was the waiver by petitioner of its right to require the State to buy the machinery, petitioner argues that there exists a rule of law which requires this Court to shut its eyes to such realities and give full effect to the language of the contract stating the $725,000 was for the property. Petitioner cites case law for this proposition. We are unable, however, to find in the cases petitioner cites the principle of law which petitioner urges on us. In *Marshall C. Allaben*, 35 B.T.A. 327 (1937), the State of Connecticut purchased 4.151 acres of land for $40,000. The sale was negotiated as a simple sale of land and was so reflected on the purchase voucher. The taxpayer was not permitted to treat part of the price as "consequential damage" to the remainder of his tract. The case is not controlling here because in the present case, unlike *Allaben*, both the negotiations and the documentation show that petitioner here gave up something of substantial value beyond the mere land, building, and nonmovable machinery, i.e., its waiver of its right to insist on selling rather than moving its movable machinery.

In *Estate of Jacob Resler*, 17 T.C. 1085 (1952), the Federal Government paid taxpayer's partnership $1,553,189.46 for property taken. The partnership had claimed a right to receive rent from the Govern-

ment for a period of about 3 months at $17,729.82 per month, as well as just compensation for the taking. The United States contested the partnership's right to rent. The partnership offered to settle the entire matter for a payment of $1,554,000, which the Government representative advised the Attorney General was "lower than any usable appraisal." The offer was accepted. A "Stipulation for Judgment" was executed by the parties which recited that the partnership accepted the amount of $1,553,189.46 "as full, adequate and just compensation for the taking of said property, and all damages resulting therefrom." There was no reference to rental in the stipulation or the order of the court. Respondent claimed that $53,189.46 represented rent, but this Court rejected that contention. This case is, again, distinguishable, because there was no evidence that the Government there ever agreed it was obliged to pay any rent, because the Government considered the property itself (absent rent) to be worth more than the settlement offer, and because the settlement agreement contained no reference to any rental payment or waiver of right to rental. In our case it is clear that neither party considered the land and building, absent the waiver, to be worth anywhere near $725,000, the waiver appeared on the face of the agreement in the form of the express obligation to retain the machinery, and it is clear that both parties were aware of and bargained with respect to the rights waived.

In *Claude B. Kendall*, 31 T.C. 549 (1958), the State of Indiana paid the taxpayer $98,000 on a taking and the Commissioner contended unsuccessfully that $24,000 was really consideration for lost profits. Again, however, the case is readily distinguishable from the present case because the record showed that neither in negotiations nor in the right-of-way grant was there any reference, or bargaining with respect to, loss of profits, and because on the facts "there would be no basis for claiming such items." (31 T.C. at 553).

The other authorities cited by petitioner are of no more help to it than the cases above. It is impossible to conclude that the case law requires us to put on blinders and refuse to recognize and give effect to the fact that the agreement before us by its terms contained a waiver which was both valuable to the State and expensive to the petitioner.

The above discussion of the cases on which petitioner relies, giving petitioner the benefit of any doubt, proceeds on the assumption that each of those cases is still good law. This may not in fact be true, as more modern authority tends to be less reluctant to permit the Commissioner to look behind the apparent monolithic simplicity of a lump-sum award, and earlier cases holding that this may not be done have, perhaps, lost some of their vitality. See, e.g., *Vaira* v. *Commissioner*, 444 F. 2d 770 (C.A. 3, 1971); *Russell C. Smith*, 59 T.C. 107 (1972); *William C. Ferreira*, 57 T.C. 866 (1972); *Arch B. Johnston*,

42 TC. 880 (1964) ; *L. A. Beeghly*, 36 T.C. 154 (1961). Such a trend has much to commend it, for it is in accord with the principle that taxation is a practical matter and that no stroke of the pen should preclude the Commissioner's inquiry into underlying realities. This is, however, a matter we need not here consider, for even the strictest of the older cases does not preclude allocation of part of a contractually agreed lump sum to a valuable right expressly set forth in the agreement. Here petitioner in the contract itself expressly bestowed two things of value on the other party, and the Commissioner need not unquestioningly accept the contract's recital that all of the consideration was paid for only one of them.

Petitioner also argues that the parol evidence rule precludes respondent from going behind the written agreement of June 30, 1967, between petitioner and the State of California to vary its clear terms attributing the entire $725,000 payment to the property taken. The cases are consistent, however, in holding that where respondent was not a party to the agreement, he can introduce parol evidence to vary the terms of the contract. *Walter Lacy*, 39 T.C. 1100 (1963), affd. 341 F. 2d 54 (C.A. 10, 1965) ; *Haverty Realty & Investment Co.*, 3 T.C. 161 (1944). Accordingly, since respondent was not a party to the contract in issue, petitioner cannot invoke the parol evidence rule against him. *Walter Lacy*, 39 T.C. at 1104. In any event, the contract itself expressly obligated petitioner to retain and remove the machinery, and thereby to waive the right petitioner would otherwise have had to have the machinery condemned. We doubt that the parol evidence rule would, even between the parties, prevent the introduction of evidence showing that a portion of the lump-sum amount was allocable to this highly material waiver.

We find no rule of law which binds this Court to accept uncritically the parties' formal allocation of all the consideration to the land and building. Accordingly, we give effect to the realities of the situation. Giving such effect, we find that the amount received for the waiver is ordinary income. Even when a taxpayer has a present, existing contract right to sell property to another, payments made by the "buyer" to be relieved of his obligation to purchase have been uniformly held to constitute ordinary income and not gain from the sale of a capital asset. *Binns* v. *United States*, 385 F. 2d 159 (C.A. 6, 1967) ; *Harold S. Smith*, 50 T.C. 273 (1968), affirmed per curiam 418 F. 2d 573 (C.A. 9, 1969) ; *Gerald Melone*, 45 T.C. 501 (1966) ; *Ralph A. Boatman*, 32 T.C. 1188 (1959) ; *A. M. Johnson*, 32 B.T.A. 156 (1935). Although in a hairsplitting sense, one could analyze such a transaction as a "sale" to the buyer of "property" in the form of the seller's contract rights against the buyer, the courts have not indulged in such

attenuated analysis. This being so, the payment made here, not for an existing perfected right, but to prevent such a right from ever coming into existence, even more clearly did not represent the proceeds of a sale or exchange of a capital asset. The petitioner remained the owner of the machinery in question. The grant of the waiver did not constitute the sale or exchange of any capital asset held by petitioner, and the consideration for the waiver, therefore, was ordinary income.

Respondent determined that the amount of the award paid for property was $317,808, and that the remaining portion ($407,192) less an allocable portion of legal fees ($15,008) was includable in petitioner's income. Petitioner has the burden of proof as to the amount of the deficiency, if any. Rule 32, Tax Court Rules of Practice. Petitioner here has taken an all-or-nothing stand. Having found for respondent on the principle of law that the lump-sum award is allocable, and in the absence of any proof to the contrary, we also find for respondent that the amount of the award includable in petitioner's income is $392,184 ($407,192 income less legal fees of $15,008).

The fact that respondent in his statutory notice of deficiency affixed the erroneous label of "reimbursements for costs to relocate" to that portion of the $725,000 which constituted payment for petitioner's waiver of its right to sell the machinery to the State does not preclude this Court from finding a deficiency in this case. The essential part of respondent's determination was his determination that $407,192 of the $725,000 represented "ordinary income" and not an "amount paid for property taken." This determination was correct, and any inaccuracy in respondent's argument and in the notice of deficiency characterizing the nature of the amount in question as "reimbursements for costs to relocate" was in no way prejudicial to petitioner. *Gowran* v. *Commissioner*, 87 F. 2d 125 (C.A. 7, 1936), reversed on other grounds 302 U.S. 238 (1937).

Reviewed by the Court.

*Decision will be entered for the respondent.*

---

SCOTT, *J.*, concurring: While I agree with the result reached by the majority, I arrive at this result because the facts as found by the majority indicate that only $317,808 of the $725,000 payment to petitioner by the State of California was for property. The amount, if any, of the $407,192 balance expended by petitioner to defray the cost of moving the machinery the ownership of which it retained, to its new location is deductible as an ordinary and necessary business expense in the year paid or incurred. *Electric Tachometer Corporation*, 37 T.C. 158, 161 (1961). An advance for or reimbursement of a deductible expense is

generally ordinary income. The facts as found by the majority persuade me that any of the $407,192 remaining after petitioner paid the expenses of moving the machinery, title to which it retained, was not received by petitioner as reimbursement for the property taken by the State. Therefore, in my view, any such balance should be treated as ordinary income.

DRENNEN, *J.*, dissenting: I agree with Judge Wiles that when considered in the light of the purpose of section 1033, this Court is not justified in ignoring the terms of this particular contract which was undoubtedly negotiated at arm's length by the parties, with both parties benefiting to some extent by the settlement agreement. The proceeds petitioner received under the agreement were received for business assets, so section 1033 should apply.

I would simply add the suggestion that the majority opinion shies away from respondent's argument that a part of the amount received by petitioner was for moving machinery and loss of profits, presumably because under California law the State could not make a payment for such purposes in excess of $3,000; yet there is no indication in the majority opinion that the State could make a payment of $407,192 for a waiver of petitioner's right to have all of the machinery condemned and paid for, which the majority concludes a part of the payment was for. I also think that when the Court concludes that a part of the payment was allocable to a waiver, which was not argued by either party, petitioner should have the opportunity to argue whether a payment for a waiver of such right is within the scope of section 1033, see *Conran* v. *United States*, 322 F. Supp. 1055 (E.D. Mo. 1971), and if not whether the payment is to be taxed as ordinary income or capital gain.

FORRESTER, FAY, and GOFFE, *JJ.*, agree with this dissent.

QUEALY, *J.*, dissenting: I find it difficult to justify the allocation of the gain in question to the payment for a waiver of the right that the taxpayer had to insist that the condemnation include the machinery and equipment. Rather, it would appear that the amount was a negotiated settlement which included compensation for the loss sustained by reason of what amounted to an involuntary conversion of the difference between the value of the machinery in place and the value of the machinery on its removal from the premises.

This position is supported by the legislative history of section 1231. That section was enacted as section 117(j) of the Revenue Act of 1942 as a result of the decision of the Supreme Court in *Helvering* v. *Flac-*

*cus Leather Co.*, 313 U.S. 247 (1941). By analogy, in the case of casualty losses, the Internal Revenue Service takes the position that the loss should be measured by the fair market value of the property immediately before the event and the fair market value of the property immediately subsequent to the event. If that measure is applied in the case before this Court, it appears that the difference between the fair market value of the machinery in place and the fair market value of the machinery on the sidewalk would exceed the gain in question.

GOFFE, *J.*, agrees with this dissent.

---

WILES, *J.*, dissenting: I respectfully dissent from the majority opinion in this case. This Court has repeatedly held that section 1033 is a relief measure designed to prevent inequitable incidences of taxation and, therefore, should be construed liberally to effectuate its purposes. *Gaynor News Co.*, 22 T.C. 1172, 1177 (1954) ; *John Richard Corp.*, 46 T.C. 41, 44 (1966) ; *William B. Cusack*, 48 T.C. 156, 163 (1967).

I believe that the majority opinion unrealistically portrays the substance of the transaction in issue. It is submitted that the following description of the transaction would be more accurate. In December 1966, the State notified petitioner that it was going to condemn petitioner's business property located at 3825 City Terrace. The machinery located thereon was by State law part of the real property that was required to be condemned and, therefore, proper payment would have to be given to petitioner for the same. At this point, petitioner was willing to accept payment for all of its condemned property including the machinery. The State, however, desired to condemn petitioner's property in the least expensive manner. Because it would lose money on resale of the machinery, the State determined that petitioner's property was worth more to it without the machinery. The State, therefore, bargained to pay petitioner less than the value of all of the property provided that the petitioner retained the bulk of its machinery. I believe that the State paid petitioner a premium for the property purchased because of the savings that the overall arrangement provided it. Through an arm's-length negotiation the parties bargained for and agreed to a price for the property purchased. Although this price certainly was affected by overall considerations, it nevertheless reflected a price that the State was willing to pay for the property it purchased. In short, there was a purchase and sale of designated property at a designated price and that price when received was for income tax purposes the amount realized for the property sold. *Lapham* v. *United States*, 178 F. 2d 994 (C.A. 2, 1950). Petitioner reinvested the entire amount of the sales proceeds in similar property. Taking this

view of the instant transaction, I believe petitioner has fulfilled the requirements of section 1033 and is entitled to defer recognition of gain.

I believe this application of section 1033 is consistent with the declaration of the Ninth Circuit, to which appeal lies in this case, that its purpose is "to aid the taxpayer where he in good faith quickly transforms everything he received from the act of condemnation into property 'similar or related in * * * use.'" *Commissioner* v. *Babcock*, 259 F. 2d 689, 692 (C.A. 9, 1958).

FORRESTER, DRENNEN, FAY, and GOFFE, *JJ.*, agree with this dissent.